J-A06026-18

2018 PA Super 132

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA R. MOSER | : | No. 1225 WDA 2017 |

Appeal from the Order Entered August 1, 2017
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0000223-2015

BEFORE: BENDER, P.J.E., SHOGAN, J., and STRASSBURGER*, J.

OPINION BY SHOGAN, J.:                                    FILED MAY 18, 2018

The Commonwealth appeals[1] from the order granting the motion to suppress filed by Appellee, Joshua R. Moser ("Moser"). After careful consideration, we reverse and remand.

The trial court summarized the factual history of this case as follows:

On May 26, 2013, Tim Allen Frye (hereinafter "Frye") was at his residence at 58 Beeno Road, New Stanton, Pennsylvania. At approximately 1:00 a.m., Frye heard a sound that resembled a car hitting a bank. Approximately twenty (20) to thirty (30) minutes later, Frye saw an ambulance and police with their lights activated on Route 136. Frye estimated that the scene was approximately two-hundred (200) feet away from his residence.

Nicholas D'Orazio, Jr. (hereinafter "Mr. D'Orazio"), owner of the 2000 Dodge Stratus automobile, testified that the vehicle was

_____

[1] The Commonwealth has certified in its notice of appeal that the trial court's order suppressing physical evidence substantially handicaps the prosecution of this case. Pa.R.A.P. 311(d); Commonwealth v. Moser, 999 A.2d 602, 604-605 (Pa. Super. 2010).

_____

* Retired Senior Judge assigned to the Superior Court.

normally operated by his son, Nicholas A. D'Orazio (hereinafter "D'Orazio"). Mr. D'Orazio testified that, on May 26, 2013, the vehicle was parked at his son's residence. Mr. D'Orazio did not give [Moser] permission to use his vehicle.

D'Orazio testified that, on May 25, 2013, he traveled to Lake Erie for the weekend and left his vehicle, the 2000 Dodge Stratus, at 2065 Main Street, Arona, Pennsylvania. [Moser] called D'Orazio in the middle of the night and then again in the morning. D'Orazio spoke to [Moser] during the morning phone call, and before that conversation, [Moser] left a voicemail that stated, "Nick, I stole your car, I completely totaled it, and I killed my friend." D'Orazio stated that [Moser] was hysterical during the phone call. D'Orazio then called his father to inform him of what had happened. D'Orazio stated that, between May 25th and May 26th of 2013, he never gave [Moser] permission to use his vehicle.

Jacob Vranish (hereinafter "Vranish") and his then girlfriend Alyssa Grushecky (hereinafter "Grushecky") were travelling on State Route 136 in the early morning hours of May 26, 2013. While traveling down into the valley, Vranish noticed debris on the road along with a vehicle. Vranish stated that the vehicle was on the bank and a little on the hillside. Vranish did not see anyone at the scene when a group of young women in a vehicle stopped and told him that they saw someone running away from the scene. Vranish then called 911. Between the time Vranish called 911 and the firefighter arrived, [Moser] arrived on the scene. [Moser] asked if anyone was in the car, and then he and Vranish proceeded to walk along the hillside, when Vranish noticed someone lying on the hillside. At this point, [Moser] knelt by the Victim, picked him up, yelled "Josh!" tried to give the victim CPR, and then realized the victim had passed away. [Moser] told Vranish he was not driving. Vranish heard [Moser] make a phone call and said, "Josh was dead." [Moser] kept telling Vranish and Grushecky that he was sorry.

Trooper Joshua B. Johnson (hereinafter "Officer Johnson") and Trooper Paul Ton[o]ni (hereinafter "Officer Ton[o]ni") were dispatched to a one motor vehicle crash on State Route 136 at approximately 1:00 a.m. Trooper Johnson indicated that the vehicle had struck a stump that was off the road. Trooper Johnson indicated that [Moser] appeared to be under the influence of alcohol since [Moser] was emitting an odor of alcoholic beverage, his eyes were bloodshot and glassy, and his speech was slurred.

[Moser] told Trooper Johnson that he had been at a friend's house drinking, and that he went to a few places in Hermin[i]e. [Moser] remembered flashes of driving fast. [Moser] also remembered being in the driver's seat after the crash, and that he had to force the driver's door of the vehicle open. [Moser] stated that, after the crash, he walked down the roadway to call his friends. [Moser] admitted that, after he returned to the crash, he attempted to do CPR on the other occupant of the vehicle. [Moser] explained that he drives on Route 136 often and knows the speed limit to be between 35 and 45 miles an hour. [Moser] stated that the vehicle belonged to his roommate who was in Erie, and that he did not have a Pennsylvania Driver's License. [Moser] further told Trooper Johnson that he was unable to drive because he did not have a Pennsylvania driver's license. Trooper Ton[o]ni testified that [Moser] was adamant that he wasn't the driver of the vehicle. In Trooper Johnson's report, it provided that [Moser] made a statement that he did not know if there was anybody else in the vehicle with him. [Moser] provided the name of "Josh" to Trooper Johnson regarding the fatality involved in the crash.

Trooper Johnson instructed [Moser] to perform field sobriety tests, which [Moser] failed. Trooper Johnson formed the opinion that [Moser] was under the influence of alcohol to such an extent that he could not safely drive. Trooper Tononi also witnessed [Moser] perform the field sobriety tests, and concluded that [Moser] was impaired. [Moser] was then handcuffed, placed under arrest, and put into the back of a patrol vehicle. Trooper Tononi confirmed that [Moser] was taken into custody and then transported to Westmoreland County Hospital. As Trooper Johnson and Trooper Ton[o]ni were taking [Moser] to the hospital, they informed him as to why they were going, and requested that [Moser] submit to a blood test to determine his BAC, and [Moser] agreed. [Moser] was taken to the Westmoreland Hospital in Greensburg, Pennsylvania. Trooper Johnson advised [Moser] of the implied consent form and the O'Connell Warnings,[2] and [Moser] indicated that he understood. Trooper Johnson read

_____

2  An O'Connell warning specifically informs a motorist that his or her driving privileges will be suspended for one year if he or she refuses chemical testing. Com., Dept. of Transp., Bureau of Traffic Safety v. O'Connell, 555 A.2d 873, 877-878 (Pa. 1989).

[Moser] the DL -26 form.[3]  [Moser] did not sign the DL-26 form, but held out his arm instead.  Trooper Johnson never asked for a search warrant for [Moser's] blood sample.  [Moser] agreed to submit to a blood sample, and [Moser's] sample was collected at 2:50 a.m. at the hospital.  The victim was identified as Joshua Michael Jordan.

Trial Court Opinion, 9/26/17, at 1-3 (internal citations omitted; footnotes omitted).

Moser was charged with homicide by vehicle while under the influence of alcohol or controlled substance ("DUI"), three counts of DUI, homicide by vehicle, exceeding maximum speed limit by thirty miles per hour, driving at an unsafe speed, unauthorized use of automobile, accident involving death or personal injury while not properly licensed, and driving without a license.[4]  On March 17, 2017, Moser filed a motion to suppress the results of the blood test. Moser argued that the warrantless blood draw was a violation of the United States Supreme Court's holding in Birchfield v. North Dakota, ___ U.S. ___, 136 S.Ct. 1535 (2016).[5]  On August 1, 2017, the trial court entered an order granting Moser's motion to suppress the blood test results.  The Commonwealth filed an appeal on August 21, 2017.  The trial court entered

_____

[3]  The DL–26 Form informs an arrestee for driving under the influence ("DUI") of the Implied Consent Law and alerts him to the consequences of refusing to submit to chemical testing.  Nardone v. Com., Dept. of Transp., Bureau of Driver Licensing, 130 A.3d 738, 741 (Pa. 2015).

[4]  75 Pa.C.S. § 3735(a); 75 Pa.C.S. § 3802; 75 Pa.C.S. § 3732(a); 75 Pa.C.S. § 3362(a)(3-30); 75 Pa.C.S. § 3361; 18 Pa.C.S. § 3928(a); 75 Pa.C.S. § 3742.1(a); and 75 Pa.C.S § 1501(a), respectively.

[5]  Moser also cited Commonwealth v. Giron, 155 A.3d 635 (Pa. Super. 2017), and Commonwealth v. Evans, 153 A.3d 323 (Pa. Super. 2016).

an order on September 22, 2017, continuing the case pending the decision by this Court. The trial court issued an opinion in compliance with Pa.R.A.P. 1925.

The Commonwealth presents the following issues for our review:

1. The Suppression Court erred in suppressing the blood test results. The Commonwealth contends that [Moser] had voluntarily consented to the blood draw before the Trooper read the implied consent warnings from the DL-26 form to him. Thus, his consent was not tainted by the warnings. Commonwealth v. Haines, 168 A.3d 231, 236 (Pa. Super. 2017).

2. Because the warrantless blood draw was conducted pursuant to well-established statutory and case law, and the request was supported by probable cause, the Commonwealth contends that suppression of the results is not warranted. A narrow good faith exception to the exclusionary rule should apply to pre-Birchfield cases where the law enforcement officers followed long-established procedures.

Commonwealth's Brief at 8.

In its first issue, the Commonwealth argues that the trial court erred in granting Moser's motion to suppress the results of his blood test. Commonwealth's Brief at 8. The Commonwealth maintains that Moser voluntarily consented to the blood draw before the trooper read to Moser the implied consent warnings from form DL-26, which threatened additional criminal penalties if Moser refused the blood test. Id. at 8, 13. The Commonwealth posits that because the officer read form DL-26 to Moser after Moser consented to the blood draw, Moser was not "coerced" by language in the form regarding heightened penalties. Id. at 13.

When the Commonwealth appeals from a suppression order:

we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

Commonwealth v. Miller, 56 A.3d 1276, 1278–1279 (Pa. Super. 2012) (citations omitted). We may consider only evidence presented at the suppression hearing. In re L.J., 79 A.3d 1073, 1085–1087 (Pa. 2013).

This Court has summarized the holding in Birchfield and its application to Pennsylvania's implied consent statutes as follows:

In Birchfield, the United States Supreme Court recognized that "[t]here must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." Birchfield, 136 S.Ct. at 2185. Of particular significance, Birchfield held that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." Id. at 2185–2186. Accordingly, this Court has recognized that Pennsylvania's implied consent scheme was unconstitutional insofar as it threatened to impose enhanced criminal penalties for the refusal to submit to a blood test. Commonwealth v. Ennels, 167 A.3d 716, 724 (Pa. Super. 2017), reargument denied (Sept. 19, 2017) (noting that "implied consent to a blood test cannot lawfully be based on the threat of such enhanced penalties"); Commonwealth v. Evans, 153 A.3d 323, 330–31 (Pa. Super. 2016).

Commonwealth v. Kurtz, 172 A.3d 1153, 1157 (Pa. Super. 2017).

Despite Moser's assertion to the contrary, Birchfield is not controlling in the case at hand. As explained above, Birchfield applies to situations in which a defendant's consent is obtained based upon the threat of additional

- 6 -

criminal penalties if the blood test is refused. Here, although form DL-26 was read to Moser and improperly warned of criminal penalties if the blood test was refused,[6] Moser's consent was not obtained after he was read the DL-26 form. Instead, he consented to the blood draw prior to the reading of the form, in the police cruiser on the way to the hospital.

This Court's decision in Commonwealth v. Haines, 168 A.3d 231 (Pa. Super. 2017), is instructive. In Haines, we addressed a situation in which it was unclear as to whether the defendant had consented to the blood test before or after having been read the DL-26 form that improperly threatened criminal penalties for refusal to submit to the blood test in violation of Birchfield and its progeny. We explained that:

> [I]f Haines validly consented before being informed that he faced enhanced criminal penalties for failure to do so, then his consent would not be tainted by the warning and the blood test results would be admissible. If, however, he did not consent until after [the officer] informed him that he would face enhanced criminal penalties if he refused to consent, then the trial court did not necessarily err in granting his motion to suppress the test results.

Haines, 168 A.3d at 236 (emphasis in original). Thus, pursuant to Haines, if consent was provided prior to the reading of the DL-26 form, then the consent would not have been tainted by the threat of additional criminal penalties and, therefore, would not be in violation of Birchfield.

_____

[6] The Commonwealth does not dispute that form DL-26 read to Moser improperly referenced additional criminal penalties for refusal of the blood test.

- 7 -

Here, Moser gave his consent to the blood test while he was in the patrol car on the way to the hospital. N.T., 6/27/17, at 18-21. Officers read form DL-26 to Moser at the hospital, after he had already consented to the blood draw. Id. at 20-21. Accordingly, Moser's consent was not tainted by the threat of additional criminal penalties as outlined in form DL-26, and therefore, was not obtained in violation of Birchfield and Evans. Consequently, the trial court erred in suppressing Moser's blood test results on this basis.

Furthermore, we need not consider the voluntariness of Moser's consent given to officers prior to arriving at the hospital. Moser makes no assertion before this Court that his consent was not voluntary. Moreover, Moser's motion to suppress seeks suppression of his blood test results on the basis of the holding in Birchfield;[7] Moser did not challenge the voluntariness of his consent given to officers prior to his arrival at the hospital in that motion. Motion to Suppress Evidence Nunc Pro Tunc, 3/17/17 at 1. "[A]ppellate review of [a ruling on] suppression is limited to examination of the precise basis under which suppression initially was sought; no new theories of relief may be considered on appeal." Commonwealth v. Little, 903 A.2d 1269, 1272-1273 (Pa. Super. 2006); see also Commonwealth v. Thur, 906 A.2d 552, 566 (Pa. Super. 2006) ("When a defendant raises a suppression claim to the trial court and supports that claim with a particular argument or arguments,

_____

[7] For reasons stated previously, we note that Moser is incorrect in his assertion that Birchfield is controlling in this case.

- 8 -

the defendant cannot then raise for the first time on appeal different arguments supporting suppression.").

Accordingly, the trial court erred in granting Moser's motion to suppress the blood test results on the bases of Birchfield and Evans. Thus, we are constrained to reverse the trial court's order granting Moser's motion to suppress the blood test results.[8]

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

P.J.E. Bender joins the Opinion.

Judge Strassburger files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/18/2018

_____

[8] Based on our determination of the Commonwealth's first issue, we need not address its second.